20-117

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARIO BADESCU SKIN CARE, INC., | ) | |
| | ) | Docket No. |
| Plaintiff, | ) | |
| | ) | ECF CASE |
| -against- | ) | |
| | ) | **AMENDED COMPLAINT** |
| SENTINEL INSURANCE COMPANY, LIMITED, | ) | |
| | ) | **JURY DEMANDED** |
| | ) | |
| Defendant. | ) | |

Plaintiff MARIO BADESCU SKIN CARE, INC. (hereinafter, "Mario Badescu"), by its attorneys WEG AND MYERS P.C., as and for its First Amended Complaint against Defendant SENTINEL INSURANCE COMPANY LIMITED (hereinafter, "Sentinel"), hereby alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff has commenced this action against Sentinel for Sentinel's breach of their contractual obligations in failing to compensate Plaintiff pursuant to the terms of an all-risks policy of insurance issued by Defendant to Plaintiff for a non-excluded loss suffered by Plaintiff beginning on or about March 16, 2020, as a result of the SARS-CoV-2 pandemic.

2. Plaintiff operates a salon at 320 East 52nd Street, New York, New York 10022 (the "Premises"), where Plaintiff provides personal salon services including but not limited to facials, massages, waxing, electrolysis, manicures, pedicures, body wraps, and other services by skilled aestheticians (the "Salon Services").

1

3. The Salon Services involve close physical contact between the salon staff and its patrons. For example, a facial involves salon staff using their hands to massage cleanser into a patron's face, neck, and décolletage while the patron is seated in a reclining position.

4. Similarly, a massage would involve the salon staff using their hands to physically alleviate a patron's back or neck tension, generally with the use of massage oil or lotion as a lubricant while the patron rests on a massage table.

5. Although salon staff take care to properly cleanse surfaces and applicators to avoid cross-contamination between patrons, surfaces and certain products are necessarily used for more than one patron, with multiple salon staff exposed to same.

6. As such, the presence of any contaminant or virus on any surface or product or within the environment within Plaintiff's Premises represents a physical loss or damage at Plaintiff's business.

## PARTIES

7. At all relevant times herein mentioned, Plaintiff Mario Badescu was and is a domestic business corporation created under and by virtue of the laws of the State of New York, with its principal place of business at 320 East 52nd Street, New York, NY 10022.

8. At all relevant times herein mentioned, Defendant Sentinel was a foreign corporation organized and existing under and by virtue of the laws of the State of Connecticut and maintaining its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

## JURISDICTION AND VENUE

9. This action is filed under and pursuant to 28 U.S.C. § 1332, in that Plaintiff and Defendant are residents of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

10. This action involves a dispute as to the rights and obligations of the parties in connection with an insurance policy that Plaintiff procured from Defendant, a foreign corporation authorized by the Department of Financial Services of the State of New York to issue policies of insurance in the State of New York that regularly insures individuals in the State of New York and specifically in this District.

11. Pursuant to 28 U.S.C. § 1391(b)(2) venue is proper as Plaintiff is a business organized and existing under and by virtue of the laws of the State of New York, and the property at issue in this litigation is located in the Southern District of New York.

12. An actual controversy of a justiciable nature exists between Plaintiff and Defendant involving the rights and obligations of the aforesaid policy of insurance and the aforesaid controversy can be determined by the judgment of this Court without further suit.

## THE NOVEL CORONOAVIRUS AND ITS EFFECTS

13. It is beyond cavil that the world is currently experiencing a global pandemic from a disease caused by a novel coronavirus (specifically, SARS-COV-2) and commonly referred to as Covid-19.

14. From at least as early as December 2019, Covid-19 began spreading, first in China and then, because the disease is highly contagious, rapidly around the globe.

15. On January 30, 2020, the World Health Organization (WHO) declared the Covid-19 outbreak constituted a public health emergency of international concern.

16. Not only is SARS-COV-2 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can remain infectious on objects or surfaces.

17. By February 25, 2020, the Center for Disease Control ("CDC") warned Americans that the world was on the brink of a global pandemic, effectively dismantling any notion that

SARS-COV-2 would not affect the population of the United States.

19. From that point forward, COVID-19 and its damaging consequences received wide spread media attention.

19. As a result of this outbreak the Center for Disease Control began recommending that individuals stay at home and those who are not sick engage in preventive measures such as constant hand washing and the avoidance of activities that would bring them into close proximity of people or surfaces where the virus resides.

20. Given the nature of the Plaintiff's business, which specifically involves the close physical contact between salon staff and customers, the spread of the Covid-19 virus led to significant economic damages.

21. These damages resulted from damage to and from within the Plaintiffs insured premises as well as from premises within the vicinity of the various insured locations.

22. Such damage both existed on surfaces found within the insureds and surrounding premises as well as in the breathable air circulating within the insureds and surrounding premises.

23. Scientific studies suggest that the virus may remain active on surfaces for times varying from hours to days. Indeed, following an outbreak on a cruise ship, the CDC confirmed that the virus was still alive on surfaces within cabins on the ship up to seventeen days after the passengers departed the ship.[1]

24. In addition, human beings spread Covid-19 through the simple act of breathing in air that contains viral droplets. The New York Times recently reported that "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one

---

[1] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm

infectious cough."[2]

25. Moreover, studies have verified that many individuals remain asymptomatic despite infection by Covid-19.[3]

26. Consequently, while it is possible to identify certain individuals who are suffering from obvious symptoms of the coronavirus, absent significant medical testing, it is impossible to distinguish between infected and non-infected members of the general public.

27. On or about March 23, 2020, an employee of the Plaintiff who worked at the Premises advised Plaintiff that they had recently tested positive for the Virus.

28. The employee in question had last worked in the Premises on or about March 16, 2020.

29. As a result of a concern regarding the presence of the Virus at the Premises, Mario Badescu suspended operations at the Premises on March 16, 2020 in compliance with New York State Health Code regulations requiring the maintenance of a sanitary facility and the taking of precautionary measures to prevent the transmission of contagious diseases.[4]

30. Since March 16, 2020, seven additional employees who worked regularly at the Premises have tested positive for the Virus.

---

[2] https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-arul.html

[3]   https://www.usnews.com/news/health-news/articles/2020-05-28/studies-detail-rates-of-asymptomatic-cases-of-coronavirus (observing that 42% of infected persons in Wuhan, China were asymptomatic).

[4] New York City Health Code §11.31, in effect at all relevant times, provides in pertinent part: "Acts likely to spread disease prohibited. (a) No person shall intentionally or negligently cause or promote the spread of disease: (1) By failure to observe, or by improper observance of, applicable requirements of isolation, quarantine, exclusion, treatment or other preventive measures, or by failing to take other precautions in caring for cases or carriers, or suspect cases or carriers of a contagious disease; or (2) By unnecessarily exposing himself or herself to other persons, knowing himself or herself to be a case or carrier, or suspect case or carrier of a contagious disease…"

31. On March 18, 2020, the Governor of New York issued Executive Order No. 202.6 (the "Workplace Reduction Order"). The Workplace Reduction Order required businesses throughout New York State to reduce the number of employees by 50%.[5]

32. The Workplace Reduction Order applied to all businesses in Manhattan, including hundreds of businesses located in office buildings within the vicinity of the Insured Property, upon which Plaintiff was dependent for regular foot traffic and clientele.

33. Major workplaces within 0.5 miles of the Insured Property, upon which Plaintiff depended for regular foot traffic and clientele, include but are not limited to the Waldorf-Astoria Hotel, the Chrysler Building, Trump Tower, Bloomingdale's, and the United Nations (the "Dependent Properties").

34. On March 19, 2020, the Governor of New York issued Executive Order No. 202.7 (the "Salon Order"). The Salon Order stated as follows: "Effective March 21, 2020 at 8 p.m. and until further notice, all barbershops, hair salons, tattoo or piercing parlors and related personal service will be closed to members of the public. This shall also include nail technicians, cosmetologist and estheticians, and the provision of electrolysis, laser hair removal services, as these services cannot be provided while maintaining social distance."

35. The Salon Order applies to Plaintiff's Premises and normal business operations at the Premises, where Plaintiff engaged in such named services governed by the Executive Order.

36. On March 20, 2020, the Governor of New York issued Executive Order 202.8 (the "New York on Pause Order"). The New York on Pause Order required all businesses in New York

---

[5] Executive Order No. 202.6, in effect at all relevant times, provides in pertinent part: "Effective on March 20 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20 at 8 p.m."

State, with the exception of "essential businesses," to reduce their on-premises workforces by 100%.[6]

37. The New York on Pause Order applied to all businesses in Manhattan, including hundreds of businesses located in office buildings within the vicinity of the Insured Property, including but not limited to the Dependent Properties, upon which Plaintiff was dependent for regular foot traffic and clientele.

38. The Salon Order, the Workplace Reduction Order, and the New York on Pause Order (collectively, the "Executive Orders"), remained in effect in Manhattan through at least June 22, 2020, and still remain partially in effect.

39. In particular, guidance issued by New York State prohibited salons from providing facials, which are the primary service provided by Plaintiff at its salon.

40. The Executive Orders prohibited Mario Badescu from resuming normal business operations.

41. The basis of these orders were all predicated, in part, on the effect of the presence of Covid-19 within enclosed, highly trafficked locations.

42. For example, as stated in relevant orders issued by the City of New York, where Mario Badescu operates its salon location:

> WHEREAS, on March 7, 2020, New York State Governor Andrew Cuomo declared a State disaster emergency for the entire State of New York to

---

[6] Executive Order 202.6 provides, in effect at all relevant times, provides in pertinent part, "All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function."

>address the threat that COVID-19 poses to the health and welfare of New York residents and visitors; and
>
>. . .
>
>WHEREAS, this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage; and
>
>NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:
>
>. . .
>
>Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20, 2020 at 8:00 p.m., and shall further reduce its in-person workforce to the extent required by any order of the Governor issued pursuant to his powers under section 29-a of the Executive Law.

New York City Emergency Executive Order Nos. 100, 102.

43. Mario Badescu suffered business income losses as a result of the Virus beginning no later than March 16, 2020 and continuing to present.

**INSURANCE POLICY AND CLAIM**

44. On or about July 27, 2019, for good and valuable consideration, Sentinel issued to Plaintiff a certain policy of insurance bearing number 12 SBA UQ9281 SB (the "Sentinel Policy") with effective dates of July 27, 2019 through July 27, 2020 providing coverage for all risks not explicitly excluded, relevantly including physical loss or damage to the Insured Property, business income losses and extended business income losses sustained due to the necessary suspension of operations caused by physical loss or damage and other losses to Plaintiff's Insured Property, business income losses sustained as a result of access to the Insured Property being specifically

8

prohibited by a civil authority, and business income losses sustained by physical loss or damage to dependent properties.

    45.    The Sentinel Policy states:

> **A. COVERAGE**
>
> We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.
>
> 1. Covered Property
>
> Covered Property as used in this policy, means the following types of property for which a Limit of Insurance is shown in the Declarations:
>
> . . .
>
> b. Business Personal Property located in or on the building(s) described in the Declarations at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", including:
>
> (1) Property you own that is used in your business;
> (2) Tools and equipment owned by your employees, which are used in your business operations;
> (3) Property of others that is in your care, custody or control;
> (4) "Tenant Improvements and Betterments"; and
> (5) Leased personal property for which you have contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

*See* Sentinel Policy at Special Property Coverage Form.

    46.    The Sentinel Policy defines "Covered Cause of Loss" as "Risks of Direct Physical Loss unless the loss is: a. Excluded in Section B., Exclusions; or b. Limited in Paragraph A.4. Limitations; that follow."  *See* Sentinel Policy at Special Property Coverage Form A(3) (capitalization reduced).

    47.    None of the Exclusions in Section B or Limitations stated in Paragraph A.4 apply to the claim that is the subject of this litigation.

9

48. The "scheduled premises" is identified by the Sentinel Policy as 320 East 52nd Street, New York, New York 10022 (the "Premises"), at which Plaintiff operates a salon.

49. The Sentinel Policy further states:

> 5. Additional Coverages
>
> o. Business Income
>
> (1) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.
>
> (2) With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the "scheduled premises" are located, your "scheduled premises" also means:
> (a) The portion of the building which you rent, lease or occupy; and
> (b) Any area within the building or on the site at which the "scheduled premises" are located, but only if that area services, or is used to gain access to, the "scheduled premises".
>
> (3) We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage.
>
> This Additional Coverage is not subject to the Limits of Insurance.
>
> (4) Business Income means the:
> (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and
> (b) Continuing normal operating expenses incurred, including payroll.
>
> (5) With respect to the coverage provided in this Additional Coverage, suspension means:
> (a) The partial slowdown or complete cessation of your business activities; or
> (b) That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.

*See* Sentinel Policy at Special Property Coverage Form.

50. The Sentinel Policy also states:

5. Additional Coverages

p. Extra Expense

(1) We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

(2) With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the "scheduled premises" are located, your "scheduled premises" also means:
(a) The portion of the building which you rent, lease or occupy; and
(b) Any area within the building or on the site at which the "scheduled premises" are located, but only if that area services, or is used to gain access to, the "scheduled premises".

(3) Extra Expense means expense incurred:
(a) To avoid or minimize the suspension of business and to continue "operations":
(i) At the "scheduled premises"; or
(ii) At replacement premises or at temporary locations, including:
(aa) Relocation expenses; and
(bb) Cost to equip and operate the replacement or temporary location, other than those costs necessary to repair or to replace damaged stock and equipment.

(b) To minimize the suspension of business if you cannot continue "operations".

(c) (i) To repair or replace any property; or
(ii) To research, replace or restore the lost information on damaged "valuable papers and records"; to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage o., Business Income.
We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

(4) With respect to the coverage provided in this Additional Coverage, suspension means:
(a) The partial slowdown or complete cessation of your business activities; or

(b) That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Extra Expense applies to the policy.

(5) Limitation
This Extra Expense Coverage does not apply to:
(a) Any deficiencies in insuring building or business personal property; or
(b) Any expense related to any recall of products you manufacture, handle or distribute.

*See* Sentinel Policy at Special Property Coverage Form.

    51.    The Sentinel Policy additionally provides:

5. Additional Coverages

q. Civil Authority

(1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

(2) The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:
(a) When access is permitted to your "scheduled premises"; or
(b) 30 consecutive days after the order of the civil authority.

r. Extended Business Income

(1) If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:
(a) Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and
(b) Ends on the earlier of:
(i) The date you could restore your "operations" with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or
(ii) 30 consecutive days after the date determined in (1)(a) above. Loss of Business Income must be caused by direct physical loss or physical damage at the "scheduled premises" caused by or resulting from a Covered Cause of Loss.

(2) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; and
(b) That a part or all of the "scheduled premises" is rendered untenantable as a result of a Covered Cause of Loss.

*See* Sentinel Policy at Special Property Coverage Form.

      52.      The Sentinel Policy likewise states:

5. Additional Coverages

s. Business Income from Dependent Properties

(1) We will pay for the actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss.

The most we will pay under this Additional Coverage is $5,000 in any one occurrence unless a higher Limit of Insurance is indicated in the Declarations.

(2) We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:
(a) Source of materials; or
(b) Outlet for your products.

(3) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

(4) Dependent Property means property owned, leased or operated by others whom you depend on to:
(a) Deliver materials or services to you or to others for your account. But services do not include:
(i) Water, communication, power services or any other utility services; or
(ii) Any type of web site, or Internet service.
(b) Accept your products or services;
(c) Manufacture your products for delivery to your customers under contract for sale; or
(d) Attract customers to your business premises.

The dependent property must be located in the coverage territory of this policy.

(5) The coverage period for Business Income under this Additional Coverage:

13

> (a) Begins 72 hours after the time of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the premises of the dependent property; and
>
> (b) Ends on the date when the property at the premises of the dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.
>
> (6) The Business Income coverage period, as stated in Paragraph (5), does not include any increased period required due to the enforcement of any ordinance or law that:
> (a) Regulates the construction, use or repair, or requires the tearing down of any property; or
> (b) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects "pollutants."
>
> (7) The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

*See* Sentinel Policy at Special Property Coverage Form.

53. The declarations of the Sentinel Policy specify that the limit for dependent property coverage under the Subject Policy is $50,000.

54. Unlike the Sentinel Policy in question in the instant case, Sentinel has issued other insurance policies to Plaintiff and to other customers that do include virus exclusions.

55. The policy issued to Plaintiff herein does not contain any such "virus exclusions", although Sentinel had the ability to include one in the Subject Policy if it so desired.

56. On March 16, 2020, and at all relevant times herein, the Sentinel Policy was in full force and effect.

57. At all relevant times herein, Plaintiff had an insurable interest in the Insured Property.

58. As a result of the Virus contaminating the Insured Property, business income losses as a result of the physical loss and damage suffered and the consequent New York State Health Code regulations, the Salon Order, the Workplace Reduction Order, and the New York on Pause

Order, has caused Plaintiff to suffer property losses and business income losses of no less than $2,992,256.38.

59. On April 14, 2020, Plaintiff provided Sentinel with timely notice of the loss.

60. By letter dated April 22, 2020, a mere eight days after Plaintiff's notice, Sentinel denied coverage for Plaintiff's damages without having conducted even so much as a basic inquiry into the loss.

61. Notwithstanding the fact that Plaintiff provided timely notice of their property damage to Sentinel, Sentinel has not issued any payment to Plaintiff and has denied coverage.

62. The whole loss and damage suffered by Plaintiff totals no less than $2,992,256.38.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST SENTINEL
### (Breach of Contract)

63. Plaintiff repeats, reiterates and realleges each and every allegation contained within paragraphs "1" through "63," inclusively, with the same force and effect as though more fully set forth herein at length.

64. The Sentinel Policy constitutes a binding contract between the Plaintiff and the Defendant that was in full force and effect throughout the period of loss, including from on or about March 16, 2020 to present.

65. Plaintiff has performed all of its obligations under the Sentinel Policy.

66. Sentinel has affirmatively refused to pay for the damages suffered by Plaintiff, notwithstanding the fact that they constitute a covered cause of loss.

67. Sentinel denied Plaintiff's claim without any investigation, in further breach of its obligations to act in good faith to analyze any claims under the Sentinel Policy.

68. To date, Plaintiff has sustained a loss and damages estimated to total no less than $2,992,256.38as a result of Sentinel's refusal to pay pursuant to the Sentinel Policy.

**WHEREFORE**, Plaintiff demand judgment as follows:

a) On its first claim against SENTINEL INSURANCE COMPANY, LIMITED, in the amount of Plaintiff's damages, believed to exceed $2,992,256.38, plus interest thereon from March 16, 2020, together with attorneys' fees and the costs and disbursements of this action;

b) For such other and further relief as to which this Court deems just and proper.

Dated: New York, New York
　　　　March 30, 2021

　　　　　　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　**WEG AND MYERS, P.C.**
　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*

　　　　　　　　　　　　　　By:　　/s/ /Joshua L. Mallin/
　　　　　　　　　　　　　　　　　　Joshua L. Mallin, Esq. (JM0474)
　　　　　　　　　　　　　　　　　　Federal Plaza
　　　　　　　　　　　　　　　　　　52 Duane Street, 2nd Floor
　　　　　　　　　　　　　　　　　　New York, New York 10007
　　　　　　　　　　　　　　　　　　(212) 227-4210